Commonwealth ex rel. Woodside, Attorney General, *v.* Sun Ray Drug Company.

2

Argued April 28, 1955. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

*Morris Wolf*, with him *Samuel Handler, Robert B. Wolf, Compton, Handler & Berman,* and *Wolf, Block, Schorr & Solis-Cohen,* for appellants.

*Samuel M. Jackson,* Deputy Attorney General, with him *Herbert B. Cohen,* Attorney General, for appellee.

*John B. Martin,* with him *Samuel Schrekengaust, J. Grant McCabe, III., McNees, Wallace & Nurick,* and *Duane, Morris & Heckscher,* for intervening appellees.

OPINION BY MR. JUSTICE CHIDSEY, September 26, 1955:

This is an appeal from the order of the Dauphin County Court which enjoined both defendants from selling a "frozen sweetened milk product referred to in these proceedings as Malt-A-Plenty and Shake-O-Malt".

The action in equity was brought by the Commonwealth of Pennsylvania with the Association of Ice Cream Manufacturers of Pennsylvania, New Jersey and Delaware, Inc. as intervening plaintiff, against the Sun Ray Drug Company, a Pennsylvania corporation, and Carlo Galletta and Richard Nasuti, individually and trading under the fictitious name of Carl-Rich, to enjoin them from violating the Pennsylvania Ice Cream Law, Act of May 20, 1949, P. L. 1594, 31 PS §407 et seq., in that they had in their possession with intent to sell and have sold a product alleged to be an inferior simulation of ice cream. The product is known by the generic name of "ice milk". Ice milk is made of the same ingredients as is ice cream except that the finished product (herein called Malt-A-Plenty base) normally contains 3% to 5½% butterfat by weight and does not contain any flavoring or coloring. The minimum butterfat content for ice cream as required by the Ice Cream Law is 10%.

The appellants Galletta and Nasuti manufacture the ice milk product involved in this litigation, and it is purchased by appellant Sun Ray Drug Company and

other similar retailers in Pennsylvania. The chancellor found that Sun Ray Drug Company sells Malt-A-Plenty only as a dairy drink. To make the drink the Malt-A-Plenty base is combined with an equal quantity of whole milk, flavoring, and also, if the customer so desires, malted milk powder. These ingredients are mixed with a beater and served to the customer as a thick liquid drink called Malt-A-Plenty. The chancellor found that there is no difference between the taste of a Malt-A-Plenty drink so prepared and a conventional milk shake made with ice cream. A Malt-A-Plenty drink costs 24 cents, and a milk shake made with ice cream costs 30 cents.

The history and development of the Malt-A-Plenty drink was testified to by Harry B. Burt of Tulsa, Oklahoma, a past president of the National Association of Retail Ice Cream Manufacturers, who originated the drink. His testimony was undisputed. Burt has for some time been the president of a company which operates retail ice cream stores. He noticed that the sale of conventional milk shakes was falling off in his retail stores and determined that the reason was that the heavy milk fat content of milk shakes made with ice cream bloated the customer and made him feel uncomfortable. By experiment Burt discovered that if the milk fat content of the drink was decreased to the same milk fat content of whole milk, the bloating and discomfort disappeared. A formula was arrived upon which gave this desired result and the product was put on sale in Burt's stores in 1937. Burt's experience was that many customers preferred the Malt-A-Plenty drink because it was easier to digest and non-fattening. Starting in 1939 Burt began to sell generally the Malt-A-Plenty powder which is the basic constituent of ice milk. Milk drinks made from Malt-A-Plenty base became widely popular and by 1953 Burt sold enough

powder to make 8,000,000 gallons of ice milk and of course many times that many million ice milk drinks. Throughout the United States there were 17,000,000 gallons of ice milk sold in 1950 and over 45,000,000 gallons sold in 1951. The drink is healthful and nutritious, and there is in this case no contention that it is noxious in any manner.

The Pennsylvania Ice Cream Law, supra, in defining ice cream, provides in Section 1: ". . . The finished product shall contain not less than ten per centum (10%) of milk fat by weight . . .". Section 1 also defines "imitation ice cream" or "ice cream substitute" as ". . . (1) any frozen sweetened product regardless of the name under which it is manufactured, sold, or offered for sale, which is made in imitation or semblance of or is manufactured in a manner similar to the process used in manufacturing but is not ice cream, custard ice cream, french ice cream, frozen custard, sherbet, ice, fruit ice, frozen ice confection or frozen sherbet confection, as defined in this act, . . .". The Act then requires custard ice cream, french ice cream, french custard and frozen custard to conform to the standard of ice cream as defined and in addition to contain not less than 1.4% of egg yolk solids. Sherbet is required to contain not less than 3% and not more than 5% of milk solids. Fruit ice can contain no butterfat and must contain not less than thirty-five one hundredths percent. of harmless organic acid. There are no requirements for any butterfat content of ice or frozen fruit confections.

Section 3 of the Act provides that any frozen sweetened product referred to in the Act shall be deemed to be adulterated: ". . . Fifth. If it is imitation ice cream or ice cream substitute, as defined in this act. Sixth. If it is offered for sale from any container, compartment or cabinet which contains any article other

than ice cream, custard, custard ice cream, . . . Seventh. If it falls below the standards, or any of them, fixed for the particular product by the definition thereof contained in this act, or is falsely labeled . . .". Section 2 of the Act provides: "(a) It shall be unlawful for any person . . . to sell, offer for sale, or have in possession with intent to sell, ice cream, . . . which is adulterated, within the meaning of this act, or to sell, offer for sale, or expose for sale, or have in possession with intent to sell, any imitation ice cream or ice cream substitute, as defined in this act.". It is this section of the Act which appellants herein were determined by the court below to have violated.

In order to define the issue it is necessary to distinguish between the Malt-A-Plenty base and the Malt-A-Plenty drink. The base is manufactured by appellants Galletta and Nasuti in Philadelphia by adding skim milk powder, sugar and water to a mixture of Malt-A-Plenty powder and cream, and freezing the resulting compound. When delivered to retailers, such as appellant Sun Ray Drug Company, it is a solid or semisolid substance similar to ice cream in texture, consistency and appearance. The Malt-A-Plenty drink is what is commonly known as a milk shake and, as previously stated, is made by the retailer by adding to the base whole milk, flavoring, and, optionally, malted milk powder. This mixture is agitated with a beater and served as a thick liquid. The milk drink is called Malt-A-Plenty or Shake-O-Malt by appellant Sun Ray Drug Company, but is also known by various other names such as Shake-A-Mighty, Jumbo Shake, and Drink-A-Plenty.

Since the chancellor has found that appellant Sun Ray Drug Company sells Malt-A-Plenty only as a drink, our first consideration is to determine whether such sales violate the Ice Cream Law. The evidence

discloses that the contents of a conventional milk shake vary with the desires of individual customers, and may include no ice cream or several dips of ice cream as specified by the customer. The chancellor found that the public expects a thick, rich soda fountain drink to be made with ice cream, and that the use of Malt-A-Plenty base in a milk shake may lead to deception of the customer.[1] The Ice Cream Law does not refer to milk shakes, ice cream milk drinks, or any liquid drinks whatever. There is in Pennsylvania no statutory definition of a milk shake or standard for its ingredients. Since the Ice Cream Law does not regulate in any manner the sale of milk shakes, it furnishes no basis for an injunction against the sale of a particular type of milk shake which is admitted to be wholesome and nutritious: Cf. *Mayo v. Rice,* 160 Fla. 775, 37 So. 2d 705 (1948). The Commonwealth has laid great stress upon the possibility of deception in this case, and this contention will be considered at length later in this opinion. Although possibility of deception has no bearing upon the sale of milk shakes as a violation of the Ice Cream Law,[2] it is interesting

---

[1] It is to be noted in passing that findings as to deception of the public are conclusions of ultimate fact upon which this Court is free to draw its independent conclusions from the directly proven facts as found by the chancellor: *Goebel Brewing Company v. Esslingers, Inc.,* 373 Pa. 334, 95 A. 2d 523; *Jessar Manufacturing Corporation v. Berlin,* 380 Pa. 453, 110 A. 2d 396; *Kelly v. Philadelphia,* 382 Pa. 459, 115 A. 2d 238.

[2] Nonalcoholic drinks are not regulated by the Ice Cream Law but by other legislation, namely, the Act of March 11, 1909, P. L. 15, 31 PS §701 et seq., and the Carbonated Beverage and Still Drinks Act of May 14, 1925, P. L. 730, 31 PS §761. This was recognized by counsel for the Commonwealth and for the intervenor when, during the course of the trial, in objecting to the introduction of evidence as to the background history of the Malt-A-Plenty drink, counsel for the Commonwealth stated: ". . . this case does not concern itself with the drink. There is no drink that this case

to note that there is absolutely no evidence of deception in this case concerning the sale of the Malt-A-Plenty drink. The cups in which it is sold describe it as "that Delicious Ice Milk Dairy Drink", the price is 20% less than the price of a milk shake made with ice cream, and there is no evidence that any customer who asked for a milk shake or an ice cream milk shake was served a Malt-A-Plenty drink. Although the Commonwealth produced evidence that three investigators after ordering a Malt-A-Plenty drink questioned the counter girls and were told that the drinks contained ice cream, no confusion or deception resulted since these investigators already knew that the drink was made from the Malt-A-Plenty base and not ice cream. It is significant that there is not a word of testimony as to any confusion resulting from the use of Malt-A-Plenty base in the preparation of the ice milk drink.

We now must consider the application of the Ice Cream Law to the sale and possession of the Malt-A-Plenty base. Since Malt-A-Plenty base contains only 3% to 5% butterfat it is below the minimum standard for ice cream. It is also manufactured in a manner similar to the process used in manufacturing ice cream, and is kept by the retailer in a cabinet which contains Malt-A-Plenty base as well as ice cream. In these circumstances the Ice Cream Law, if applicable as held by the court below, would make the sale or possession of Malt-A-Plenty base illegal.

Appellants contend that the Ice Cream Law, as applied to the facts of this case by the court below is

has anything to do with. We are concerned with the Malt-A-Plenty base or ice milk. That is the pleadings in this case. It is true that there has been testimony to the effect that the base or ice milk is introduced into a container and agitated and served as a chocolate milk [sic], but that has no place in the case or in the evidence.". Counsel for the intervenor joined in this statement.

unconstitutional as an arbitrary taking of property rights in violation of Article I, Section 1 of the Constitution of Pennsylvania, and the Fourteenth Amendment to the Constitution of the United States. There is, of course, a presumption that the Ice Cream Law is constitutional: *Hadley's Case,* 336 Pa. 100, 6 A. 2d 874. Appellees argue that in addition to the presumption, the constitutionality of the Ice Cream Law was judicially determined in *Commonwealth v. Crowl,* 52 Pa. Superior Ct. 539, affirmed per curiam 245 Pa. 554, 91 A. 922, 242 U. S. 153, which considered the constitutionality of the Act of March 24, 1909, P. L. 63, the statutory predecessor of the present Ice Cream Law. The Act of 1909, supra, prohibited the sale of ice cream with less than 8% butterfat content. That case involved a conviction under the statute for selling hokeypokey, an imitation product, *as ice cream.* In discussing the application of the police power to the legislative determination of standards for food products, the Supreme Court of the United States said (p. 159) : ". . . Laws designed to prevent persons from being misled in respect to the weight, measurement, quality or ingredients of an article of general consumption are a common exercise of the police power. The legislature defines the standard article or fixes some of its characteristics; and it may conclude that fraud or mistake can be effectively prevented only by prohibiting the sale of the article *under the usual trade name,* if it fails to meet the requirements of the standard set. . .". (Emphasis supplied). In the instant case there was no sale or attempt to sell Malt-A-Plenty base as "ice cream". The *Crowl* case is, therefore, not determinative of the constitutional issue presented in this appeal, and it must be considered as a case of first impression.

The scope of the police power of the Commonwealth is necessarily very broad. As was stated in *Commonwealth v. Stofchek,* 322 Pa. 513, 185 A. 840, at p. 519: ". . . the State possesses inherently a broad police power which transcends all other powers of government. There is, therefore, no unqualified right to acquire, possess, and enjoy property if the exercise of the right is inimical to the fundamental precepts underlying the police power. . .". However, the basis of every exercise of the police power must be to promote or maintain the health, safety or general welfare of the public: *White's Appeal,* 287 Pa. 259, 134 A. 409. Since it is admitted by all the parties to this appeal that Malt-A-Plenty base is a healthful, nutritious product, the validity of the Ice Cream Law as here applied cannot rest upon its effect as a health or safety measure. In order to render restraint of the sale or possession of the Malt-A-Plenty base constitutional, such action must be in the public interest in the furtherance of the common good or general welfare of the citizens of the Commonwealth.

The standard to be applied in this type of case was well stated by Mr. Chief Justice STERN in the recent case of *Cott Beverage Corporation v. Horst,* 380 Pa. 113 (1955), 110 A. 2d 405. In that case the Chief Justice, quoting from *Gambone v. Commonwealth,* 375 Pa. 547, 101 A. 2d 634, stated at p. 118: " '. . . By a host of authorities, Federal and State alike, it has been held that a law which purports to be an exercise of the police power must not be unreasonable, unduly oppressive, or patently beyond the necessities of the case, and the means which it employs must have a real and substantial relation to the objects sought to be attained. Under the guise of protecting the public interests, the legislature may not arbitrarily interfere with private business or impose unusual or unnecessary restrictions

upon lawful occupations. The question whether any particular statutory provision is so related to the public good and so reasonable in the means it prescribes as to justify the exercise of the police power, is one for the judgment, in the first instance, of the law-making branch of the government, but its final determination is for the courts' ". In the *Cott* case this Court also recognized the rule that the sale of an article may be wholly restricted by statute even though it is not harmful for public consumption if there is danger of fraud or deception of the public in substituting an imitation article for the genuine.

The contention of the Commonwealth when reduced to its essentials is that the common good or general welfare is protected by the prohibition of the sale of Malt-A-Plenty base as such to retailers because such sales create *a possibility* of confusing, defrauding or deceiving the public in that the retailer *may* sell the base as ice cream. As has been previously pointed out, *Commonwealth v. Crowl,* supra, did not go that far. It merely sustained the legislation as constitutional on the assumption that it prohibited the sale of such products *as ice cream* where such products have less than the minimum butterfat content. In such a case the deception or possibility of deception is obvious. If, in the instant case, there had been any evidence of sales of the Malt-A-Plenty base as ice cream, such sales could unquestionably be restrained.

In support of its contention the Commonwealth relies on *Carolene Products Company v. Harter et al.,* 329 Pa. 49, 197 A. 627; *Commonwealth v. Hettinger,* 152 Pa. Superior Ct. 242, 31 A. 2d 599, and *Simco Sales Service of Pennsylvania, Inc. v. Brackin et al.,* 344 Pa. 628, 26 A. 2d 323. All of these cases are distinguishable. In *Carolene Products Company v. Harter et al.,* supra, a statute prohibited the sale of filled milk com-

pounds (milk with the butterfat content removed and coconut oil added) unless such products were packed in five pound cans and labeled: "Unfit for Infants". The nature of the product was such that it was impractical for a housewife to purchase it in five pound quantities. The court pointed out that when infants are deprived of natural milk they are subject to scurvy, rickets, respiratory diseases and afflictions of the eye, and sustained the statute ". . . in the interest of public health, especially of child welfare . . ." (329 Pa., p. 60). There is no contention that Malt-A-Plenty base, which has approximately the same butterfat content as natural milk, would not be beneficial to any group or classification of customers or consumers. In *Carolene Products Co. et al. v. United States,* 323 U. S. 18, the Supreme Court of the United States, in sustaining the constitutionality of a Federal statute which prohibited the sale of filled milk in interstate commerce, pointed out that filled milk was confused with and passed off as a whole milk product. The decision is based upon actual as well as possible deception of the public.

In *Commonwealth v. Hettinger,* supra, the Superior Court upheld a conviction under the Carbonated Beverages and Still Drinks Act, Act of May 14, 1925, P. L. 730, as amended, 31 PS §761, where the defendant simulated the appearance of pure orange juice by adding coal tar to weak orangeade. As in the *Carolene Products* case, supra, this case involved the simulation of a natural product by the addition of a cheaper artificial ingredient, which, as the court found, tended to mislead the public into believing that the bottles contained the natural product, orange juice.

*Simco Sales Service of Pennsylvania, Inc. v. Brackin et al.,* supra, is completely inapplicable since it concerned the constitutionality of an ordinance re-

quiring the name of the manufacturer of an ice cream product to appear on the wrapper.

In each of the preceding cases the interest of the public was clearly apparent and was protected by a means reasonably necessary for the accomplishment of the legislative purpose and under the facts of those cases, the means used were not unduly oppressive upon the individuals affected.

The Commonwealth also cites the following cases as authority in support of its contention that possibility of deception of the public is sufficient to justify the exercise of the police power in prohibiting the sale or possession of Malt-A-Plenty base: *62 Cases of Jam et al. v. United States*, 340 U. S. 593; *Federal Security Administrator v. Quaker Oats Co.*, 318 U. S. 218; *United States v. Carolene Products Co.*, 304 U. S. 144; *Powell v. Pennsylvania*, 127 U. S. 678; *United States v. 88 Cases, More or Less, Containing Bireley's Orange Beverages*, 187 F. 2d 967 (C.A. 3); *United States v. Two Bags, Each Containing 110 Pounds, Poppy Seeds et al.*, 147 F. 2d 123 (C.A. 6).

In *62 Cases of Jam et al. v. United States*, supra, the Supreme Court held that an imitation product clearly labeled "imitation jam" did not violate the Federal Food, Drug and Cosmetic Act, 21 U.S.C.A. §301 et seq. In the instant case the containers in which Malt-A-Plenty base is shipped are accurately labeled, and consequently this case has no application to the present appeal. In *Federal Security Administrator v. Quaker Oats Co.*, supra, farina with vitamin "D" added was held not to qualify as "enriched farina" under the regulations of the Administrator which required that "enriched farina" also contain four other substances. In *United States v. Carolene Products*, 304 U. S. 144, supra, the Supreme Court upheld a conviction under the Filled Milk Act, Act of March 4, 1923 (c. 262, 42 Stat. 1486,

21 U.S.C.A. §§61-63) under an indictment that "Milnut" was an "adulterated article of food, injurious to the public health . . .". In *Powell v. Pennsylvania,* supra, a Pennsylvania statute prohibiting the sale of oleomargarine was determined to be a proper exercise of the police power in the interest of the protection of public health. This basis for the decision is revealed in the following excerpt from the opinion (p. 684) : ". . . It is entirely consistent with that offer [of proof] that many, indeed, that most kinds of oleomargarine butter in the market contain ingredients that are or may become injurious to health. The court cannot say, from anything of which it may take judicial cognizance, that such is not the fact. Under the circumstances disclosed in the record, and in obedience to settled rules of constitutional construction, it must be assumed that such is the fact. . .".

*United States v. 88 Cases,* supra, and *United States v. Two Bags,* supra, considered the principle of so-called "economic adulteration" under the Federal Food, Drug and Cosmetic Act. In the former case coal tar dyes were added to orangeade to deepen its color and make it appear more valuable than it was. In the latter case charcoal was added to white poppyseeds to make them appear more expensive. "Economic adulteration" simply means simulation for the purpose of making an inferior product resemble a more expensive one. The theory is actually based upon the resulting confusion and deception of the public. These cases have no application in this appeal since there is no evidence that the public was confused or deceived in any manner.

In all of the cases relied upon by the Commonwealth and the intervenor to sustain the application of the Ice Cream Law to restrain the sale or possession of Malt-A-Plenty base, where the exercise of the police power

was sustained, the decisions were based upon either (1) protection of public health, or (2) actual or possible confusion or deception of the public. Where either of these conditions exist, the Legislature clearly may regulate or prohibit the sale of such products. In the instant case it is admitted that the product involved is healthful and nutritious so that protection of the public health cannot provide the basis here. Nor is there any confusion on the part of the retailers who purchase the Malt-A-Plenty base. They order it as such and it is delivered in containers plainly labeled as to the contents. It is sold to the public only as a constituent part of a milk drink. There is no evidence in this record of sale or attempts to sell Malt-A-Plenty base to a customer in that form as ice cream. However, the contention of the Commonwealth is that some unscrupulous retailers *may* sell the base as vanilla ice cream. In order to do so, it of course would be essential that there be sufficient similarity in the taste of the base and the ice cream.

The chancellor found as fact "The texture, consistency and appearance of Malt-A-Plenty base in its semi-solid form are similar to vanilla ice cream.". He made no finding as to the taste of the base. He did find that Edward Reese, a chemist, and expert witness for the Commonwealth and the intervenor, *testified* that he could distinguish Malt-A-Plenty base from vanilla ice cream only by making a chemical analysis. This does not resolve the question as to the taste of the Malt-A-Plenty base. Reese also testified that the taste of the base and vanilla ice cream were very similar but the chancellor made no specific finding on this point. It is highly significant that appellees presented no testimony by customers or consumers of ice cream as to the taste of Malt-A-Plenty base. The taste of an article of food in common use, such as ice cream

or ice milk, does not require expert testimony. In the absence of any customer testimony on the question of the taste of Malt-A-Plenty base, the chancellor properly refrained from basing a finding of similarity in taste solely upon the testimony of the expert witness. Mr. Burt, witness for appellants, testified that in the absence of flavoring or coloring in the Malt-A-Plenty base, it was impractical to use it in any way other than in the milk drink where flavoring was added. In a footnote to the adjudication the chancellor stated that he had personally examined and tasted the Malt-A-Plenty base, and commented upon the similarity in appearance, texture and consistency of the base to vanilla ice cream, but again did not refer to its taste. In the same footnote the chancellor stated that the base could readily be substituted for vanilla ice cream "in a mixed dairy drink". It is therefore clear that the findings of the chancellor are limited to possible confusion in the use of Malt-A-Plenty base in a milk shake. In these circumstances and in the absence of evidence of any sales of the Malt-A-Plenty base as ice cream, this Court must conclude that since flavoring must be added to the base in order to use it in a milk drink, the absence of flavoring would so affect the taste that any attempt to sell the base qua base as ice cream would be readily detected, and therefore there is no such possibility of deception or confusion on the part of the public as to justify employment of the police power of the Commonwealth to restrain appellants in the sale of this product. In the absence of a reasonable basis for the restraint upon the exercise of private property rights, a statute which is construed to restrict those rights must be held to be unconstitutional as so construed: *Weaver v. Palmer Brothers Company*, 270 U. S. 402; *Cott Beverage Corporation v. Horst*, 380 Pa. 113, supra.

To summarize, since the Ice Cream Law does not regulate the sale of milk shakes or establish any standard for the ingredients of a milk shake, sales of the Malt-A-Plenty drink do not constitute a violation of the statute. In the absence of any evidence of customer confusion between Malt-A-Plenty base and ice cream and of any sales of Malt-A-Plenty base as ice cream, its possession or manufacture may not be restrained. The police power may be exercised only in the public interest and may not be used as a device to restrain fair competition. The presence in this case of ice cream manufacturers of Pennsylvania, New Jersey and Delaware who compose the intervenor association, makes pertinent the following quotation from *Dairy Queen of Wisconsin, Inc. v. McDowell*, 260 Wis. 471, 52 N.W. 2d 791 at p. 792: ". . . We might inquire . . . whether it is proper, in the absence of any showing that sale of the product would prejudicially affect either the milk producer or the consuming public, that the legislature or the court should be party to an act which appears to have no purpose except to protect the interests of the eighty-five manufacturers of ice cream who now appear here against the competition of Dairy Queen.".

As succinctly stated by Mr. Justice JONES in *Hertz Drivurself Stations, Inc. v. Siggins et al.*, 359 Pa. 25, 58 A. 2d 464, at p. 50: ". . . The stifling of competition through an exercise of the State's police power is never justifiable except that it be done, and actually be, in the public interest . . . It can be properly exercised only in the public welfare; and, if exercised otherwise, the exertion will be stricken down as a perversion of the sovereign power . . .".

The decree of the court below is reversed, costs to be paid by the intervenor.