## Loblaw, Inc., v. City of Erie et al.

450

*Brooks, Curtze & Gent*, for plaintiff.

*Gerald J. Weber*, for defendants.

*John M. McLaughlin*, amicus curiæ.

EVANS, P. J., September 17, 1953.—This matter is before the court on a bill in equity to restrain the City of Erie and its elected councilmen from enforcing ordinance no. 43-1953, passed July 7, 1953.

From the pleadings and the testimony we make the following

### Findings of Fact

1. Defendant is a municipal corporation organized and existing by virtue of the laws of Pennsyvlania, and its governing body, the city council, is composed of Thomas Flatley, Kenneth W. Momeyer, Charles Downing, Arthur Boldt, and Michael Cannavino.

2. On July 7, 1953, defendant passed ordinance no. 43-1953 providing that it is contrary to public policy and unlawful for any person who operates any mercantile activity to advertise or otherwise offer to any purchasers of its goods the right to buy any coupons or to sell to any such purchaser of its goods such coupons which are redeemable at the option of such retailer or wholesaler, either in cash at face value or in merchandise, and providing a penalty for each violation.

3. Plaintiff is a New York corporation registered to do business in Pennsylvania.

4. Plaintiff has 133 retail grocery stores in operation in the States of New York, Pennsylvania, and

Ohio, and of these seven stores are located in the City of Erie, Pa.

5. On April 27, 1953, plaintiff introduced to its customers and in its stores in the City of Erie, Pa., a premium plan whereby it offers to customers the right to buy with each 50 cents' worth of merchandise purchased from plaintiff a customer premium certificate for five cents, each certificate being redeemable by the customers in cash or in premium merchandise.

6. The customer can exchange any accumulation of customer premium certificates for merchandise at any of plaintiff's stores in Erie, Pa.

7. Plaintiff has reserved the right to redeem the customer premium certificate at any time for cash at face value.

8. Plaintiff publishes a catalog indicating the premiums which can be secured, the usual retail price of the premiums, the number of customer premium certificates necessary to obtain the premium, and a statement that if the premium desired is out of stock on the particular day that it is requested that the company will secure it.

9. On July 6, 1953, there were in the possession of Erie individuals 880,000 coupons having redemption value of $44,000, this amount being carried by plaintiff on its books as an account payable.

10. On February 28, 1952, the total assets of plaintiff were $19,507,326.00, and its capital stock and surplus $9,800,691.00.

11. Plaintiff's purpose in selling the customer premium certificates is to increase its sales, to attract new customers, and to retain its regular customers.

12. In promotion of its premium plan plaintiff has expended for remodeling, installation of premium fixtures in its Erie stores, printing costs of certificates, and for rental of accounting machines in excess of $6,000.

13. On June 20, 1953, plaintiff's premium inventory in its Erie stores was $32,199.

14. Plaintiff maintains warehouses at Youngstown, Ohio, and at Syracuse, N. Y., and Buffalo, N. Y., for the purpose of supplying premiums to its various stores.

15. Plaintiff's total dollar premium sales in Erie from April 27, 1953, to July 4, 1953, amounted to $33,565.

16. Plaintiff has increased its sales in Erie, Pa., as a result of the operation of this premium plan.

17. The enforcement of the city ordinance here involved will cause plaintiff considerable loss in business and in the repackaging, reshipping, and loss of value of its premiums now in the Erie stores.

18. The premium plan introduced by plaintiff varies in form but is not substantially different from premium plans operated by other merchants in the City of Erie.

19. The ordinance specifically and exclusively selects plaintiff's premium plan for prohibition.

## Discussion

The sales promotion plan here sought to be banned by the ordinance is one of many employed in the City of Erie, particularly in the grocery trade. The object of all such plans is to increase the merchant's business. In this discussion we will touch upon only a few which under the evidence are being used at this time.

Under one plan the merchants give stamps in an amount depending on the amount of purchase. These stamps are paid for by the merchant to a third party through whom the customer receives his price or premium, depending upon the number of stamps accumulated. Under another plan merchandise is sold in containers or with coupons which entitle the customer to receive silverware or other articles free or at a cost less than ordinary in retail circles. Some merchants punch

cards to indicate the amount of purchases made and offer the customer the right to secure a wide variety of articles listed in catalogs upon surrender of the card and additional cash less than is ordinarily paid for such articles. Other merchants give free coupons with purchases made and periodically by a drawing, determine a customer to receive an article of considerable value.

The plan here attacked under the ordinance is somewhat different from other plans in that the customer pays the usual retail price for groceries which is the main commodity of plaintiff and also purchases a coupon for which he pays cash. When he has accumulated, say, five dollars' worth of these coupons he can select one of many articles listed in the catalog as available to him for this amount. The catalog, in addition to showing the purchasable items, contains a statement of a larger amount at which said articles are ordinarily sold at retail. In other words, plaintiff sells the customer groceries at the usual retail price and constitutes itself a purchasing agent of goods not regularly sold by plaintiff at wholesale cost plus a small overhead charge.

It is conceded that if the ordinance is to be sustained it must be under the police power of council in the interest of the health, welfare, and safety of the general public, otherwise it is an unconstitutional interference in plaintiff's private rights and competitive practices. There is no question raised concerning the health and safety to the public which uniformly subject private business to police power. The regular and premium merchandise sold by plaintiff is similar in kind and character to that sold by all merchants. There is no question of monopoly involved either in fact or law. This is well indicated by the fact that plaintiff has but seven stores in the City of Erie and the evidence shows that the Home Owned Food As-

sociation which has by leave of court intervened in support of the questioned legislation, represents 325 retail merchant members, many of them supermarkets similar in type to plaintiff's stores.

It is for us, therefore, to determine whether or not the public interest as distinguished from the interest of a particular class is so affected as to justify the enforcement of this ordinance. Our problem becomes more interesting in that it has been the subject of continuous litigation in the courts of almost every State since 1888, but has not had appellate consideration in Pennsylvania. The great weight of authority in other States is to the effect that such regulations are clearly unconstitutional.

In Sperry and Hutchinson Co. v. Leo A. Hoegh, Attorney General, et al., in the District Court of Iowa, in and for Polk County, in equity, no. 62031, decided July 9, 1953, is contained a complete resumé of legislation and decisions thereon affecting the subject. Therein all of the arguments advanced here on both sides are discussed and there the court arrives at the conclusions which we are constrained to reach here, viz., that the ordinance is unconstitutional.

In the Iowa case it is shown that until 1916 nearly all of the States affirmed the position that the interests of the public as a whole were in no way jeopardized or harmed in the "giveaway" or "low cost" plans which attracted customers, and there it is held that this is legitimate competitive practice in free enterprise. In 1916, however, the Supreme Court of the United States, in Rast v. Van Deman & Lewis Company, 240 U. S. 342, Tanner v. Little, 240 U. S. 369, and Pitney v. State of Washington, 240 U. S. 387, declared that legislation relative to coupons and stamps is within the police power and not unconstitutional under the fourteenth amendment to the Constitution of the United States. Thereafter, a few States, influenced by this

viewpoint, followed the reasoning there set forth and ruled likewise. The appellate courts of a majority of States thereafter refused to follow the reasoning and conclusions of these three Federal cases and reaffirmed the position that regulation of such matters is beyond the police power of the State. It is conceded that State courts are not bound by these Federal decisions, although it is argued that they are strongly persuasive. That the majority view is favored by the Supreme Court of Pennsylvania gains support from the recently decided case of Hertz Drivurself Stations, Inc., v. Siggins et al., 359 Pa. 25, wherein upon facts unrelated the underlying principles are nevertheless fully discussed and approved.

Having eliminated the questions of health, safety and monopoly, which are not involved here, we come to the question as to whether or not plaintiff's business practices prohibited by the ordinance are "affected with a public interest". In support of our conclusion we quote various paragraphs from the Hertz case pronounced by our appellate court or adopted by it from supporting decisions in other States.

"Unfortunately, there is no hard and fast rule for determining arbitrarily and conclusively when a business or property is affected with a public interest. . . .

"The instances where a private property's 'affection' with a public interest does not rest upon its capacity for monopolistic use in the performance of a service to the public in general so as to subject the property to legislative regulation and control are relatively few indeed. . . .

" 'The legislature may not under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations'. . . .

" 'To justify the State in interposing its authority in behalf of the public, it must appear, first, that the interests of the public generally, as distinguished from

those of a particular class, require such interference; and, second, that the means (employed) are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals'. . . .

" 'A business is not affected with a public interest merely because it is large or because the public are warranted in having a feeling of concern in respect of its maintenance. Nor is the interest meant such as arises from the mere fact that the public derives benefit, accommodation, ease or enjoyment from the existence or operation of the business. . . . In a sense, the public is concerned about all lawful business because it contributes to the prosperity and well being of the people'. But, that is not the kind of 'public interest' in a private business or property that renders it amenable to public regulations and control."

It is possible, as argued by intervenors particularly, that the smaller store in Erie may not be able to survive against such competitive practice and that if the ordinance is declared unenforcible, the Home Owned Food Association may be required to compete with a similar plan in order to retain its members' business. Such situations frequently arise. Large department stores sell a wide variety of goods and merchandise and through the volume of purchases, varieties of service, and advertising based on overall volume of sales, adversely affect the prosperity of a smaller store selling but one or two items of merchandise. Similarly, labor saving devices and new inventions sometimes drive existing concerns affected thereby out of business. Such developments in competitive business adversely affect the class of people who do not compete successfully with these practices but it cannot be said the interest of the public as a whole is adversely affected.

In summary, it appears that the majority of the States, including Pennsylvania, hold that police power

is operative even to the detriment or elimination of any business, practice, or condition, which affects the health, safety or morals of the public as a whole, and also in any case where a monopoly exists in fact or in law.

Other situations which might subject property or business to regulation and control are declared to be "relatively few" and we are convinced that any theory under which the control attempted here could be justified would necessarily be so broad and far reaching as to remove the principle of laissez faire under which this country has prospered so well and render impotent the constitutional provisions for the protection of free enterprise, heretofore regarded as sacred.

### Conclusions of Law

1. The ordinance is unconstitutional because it violates article I, sec. 1, of the Constitution of Pennsylvania.

2. The ordinance is unconstitutional because it is not a valid exercise of the police power.

3. The ordinance violates article III, sec. 7, of the Constitution of Pennsylvania.

4. The ordinance is unconstitutional as it violates the due process clause of the fourteenth amendment to the Constitution of the United States.

5. The ordinance is unconstitutional as it violates the equal protection of the laws clause of the fourteenth amendment of the Constitution of the United States.

6. Defendants should be restrained from enforcing ordinance no. 43-1953, passed and made effective July 7, 1953.

7. Defendants should pay the costs of this proceeding.

### Decree

Now, to wit, September 17, 1953, it is ordered, adjudged and decreed:

1. The City of Erie and its council is restrained from enforcement of ordinance no. 43-1953, passed and made effective July 7, 1953.

2. Defendants shall pay the costs of this proceeding.

The prothonotary is directed to enter this decree nisi and to give notice to the parties or their counsel of the entry of the decree, and if no exceptions are filed within 10 days thereafter, the decree shall be entered by the prothonotary as the final decree.