Key Realty Co. Zoning Case.

Argued January 4, 1962. Before BELL, C. J., MUS-
MANNO, JONES, COHEN, EAGEN and O'BRIEN, JJ.

John B. H. Donaldson, with him Lippincott & Don-
aldson, for appellant.

D. Barry Gibbons, with him Reed and Gibbons, for
appellee.

OPINION BY MR. JUSTICE COHEN, June 13, 1962:

Appellant, Key Realty Company, purchased a tract of land comprising two lots in the Borough of Media. A three-story single family residence was situate upon one of the lots. Subsequently, the building was converted into a three unit apartment house, a permitted use under the zoning classification then applicable.

At a later date, appellant attempted to obtain a permit to erect an apartment house on the second lot. The application was denied, however, because the side yard requirements of the borough zoning ordinance would not be met by the proposed structure. The zoning ordinance was amended subsequently, upgrading the area to permit the erection only of single-family detached dwellings.

Eight months after the passage of the rezoning ordinance, appellant requested a permit to erect an apartment house on the second lot. Since apartment houses were now prohibited under the applicable zoning regulations, the permit was refused. This action was sustained by the zoning board and the lower court.

Appellant maintains that the amendatory zoning ordinance is not enforceable in respect to its property and that the requested use of the lot as an apartment house is merely a lawful extension of the prior existing nonconforming use.

Even though the borough council had notice that appellant was planning to erect a second apartment house upon its land, the council did not act improperly in passing the prohibitory ordinance. Appellant acquired no vested right in the continuation of the zoning classification which permitted the erection of an apartment building. *Schmidt v. Philadelphia Zoning Board of Adjustment,* 382 Pa. 521, 114 A. 2d 902 (1955). Nor is the proposed erection of a second apartment house a natural extension of the nonconforming use to which the land was devoted. Rather, it is an at-

tempt to subject the property in question to an entirely new nonconforming use.

Appellant raises, however, the much more serious question of the validity of the amendatory ordinance, arguing that the borough council did not adopt it "in accordance with a comprehensive plan" nor with "reasonable consideration . . . to the character of the district" as required by the enabling provision of The Borough Code, July 10, 1947, P. L. 1621, §93 (§3303), as amended, 53 P.S. §48303.

Courts have taken innumerable approaches in testing whether a zoning ordinance complies with the requirement contained in the enabling act that it be "in accordance with a comprehensive plan." See Haar, "In Accordance With a Comprehensive Plan", 68 Harv. L. Rev. 1154 (1955); Haar & Hering, The Lower Gwynedd Township Case: Too Flexible Zoning Or An Inflexible Judiciary?, 74 Harv. L. Rev. 1552 (1961); Haar, Regionalism and Realism in Land-Use Planning, 105 U. Pa. L. Rev. 515 (1957), and Note, 71 Yale L. J. 720 (1962).

In *Eves v. Zoning Board of Adjustment*, 401 Pa. 211, 164 A. 2d 7 (1960), we stated that " 'Zoning is the legislative division of a community into areas in each of which only certain designated uses of land are permitted so that a community may develop in an orderly manner in accordance with a comprehensive plan.' " In *Eves*, the local ordinance permitted the township board of supervisors to rezone individual pieces of property so as to permit the use of the land in a manner not conforming with the applicable zoning classification. In reality, this plan of "flexible" or "floating" zoning was nothing more than quasi-spot-zoning by the township. Hence, we invalidated the ordinance.

Selection of individual properties or groups of properties for rezoning, even if authorized by an ordinance, is not in compliance with the statutory mandate that

zoning regulations must be "in accordance with a comprehensive plan." To fulfill this requirement, zoning legislation must reflect and implement the totality of a municipality's program of land utilization, considering both the land resources available and the needs and desires of the community. This does not contemplate a rigid "master-plan" which attempts to answer in minute detail every last question regarding land utilization; whether that plan be formulated by a planning commission or by the zoning ordinance itself. Nor, on the other hand, should it be, as in *Eves,* loose legislation permissive of ad hoc determinations of the land utilization of comparatively small sections of the community.

Rather, to conform to the requirements of the enabling legislation (53 PS §48303), a zoning ordinance must take into account all the relevant data, studies and information which contribute towards an understanding of the community's needs, and must constitute a reasonable solution of the municipality's problems of land use.

Accordingly, we do not attempt herein to evaluate whether a single property or a small group of properties would or would not fit into the overall program. Nor do we merely decide the reasonableness of a particular piece of zoning legislation and exclude from our consideration its significance within the total pattern of land use. Indeed, it is the whole program of land utilization that determines what should be done with the individual parcels.

In *Eves,* zoning regulation assumed the form of ad hoc rezoning of individual parcels; hence, we determined that it was not in accordance with a comprehensive plan. Here, on the other hand, the impact of the amendatory zoning ordinance prohibiting the erection of apartments falls equally upon all the properties within a wide area of the community.

More important, the ordinance constituted an integral part of a general land program for the municipality wherein the continued existence of this section as an area predominately of single or double homes, along with the already existing apartments, was contemplated. The amendatory act effected the rezoning of a substantial area of the borough within the framework of an overall evaluation by the council of the best practical use of the land considering the total needs of the municipality. We cannot say that the zoning legislation in question violated the legislative requirement that it be "in accordance with a comprehensive plan" merely because it was an appendage to the general zoning ordinance and has the purpose and effect of guaranteeing that the area in question will continue predominately as a neighborhood of single and twin houses.

We do not determine here that the ordinance is wise—we only decide that the change of zoning was accomplished in compliance with the requirement in the enabling legislation of The Borough Code (53 PS §48303). Appellant has not been prevented from using the property in question for an apartment house because of the harm that might be done to the owners or occupants of other lots within the district. Rather, he was prevented from so using his property because the zoning ordinance prohibiting this use and designating the area for single and double family homes was a reasonable allocation of that section of the community within the total framework of the borough's program of land utilization, and, hence, in accordance with a comprehensive plan.

Order affirmed.

CONCURRING OPINION BY MR. CHIEF JUSTICE BELL:

I concur in the result reached by the majority, but

I differ strongly with much of the reasoning and with the standards therein expressed.

This appeal raises some very important questions which are vexing many Legislative bodies throughout Pennsylvania, as well as many property owners. These questions include the question of (a) whether any clear, certain and definite standards for zoning are set forth in the particular zoning Act and in this zoning Ordinance; and (b) whether a planning commission is required; and (c) if a commission is required, whether a comprehensive plan is required, and if so, whether the legislative body must accept or may adopt or modify or ignore or reject such plan; and (d) whether there is any distinction between a comprehensive plan and a master plan; and (e) whether public hearings and public approval are required, and if so, to what extent their approval or disapproval is binding; and (f) whether a general ordinance which prescribes zoning must prescribe it for the entire township, borough or city, as the case may be; and (g) whether a broad general ordinance can itself be the comprehensive plan. These are some of the perplexing *general* questions which have been unanswered by any decision of an appellate Court in this Commonwealth. They do not include the more particular questions which are frequently raised, such as whether the act or ordinance is valid and constitutional, and/or whether it is valid and/or constitutional as applied to the appellant's particular property, and/or whether in each individual case the property owner has complied with the provisions of a valid zoning ordinance, or is entitled to an exception or a variance.

There is no field of the law which contains as much confusion as zoning. It is imperative that the Courts and the Legislative bodies attempt to substitute certainty for uncertainty, clarity for confusion, and the provisions of the Constitution for the goal of a planned

"Land Utopia". However, in this sea of constant conflict and fluctuating but continually expanding confusion there are, I believe, certain well established principles; it is therefore wise at the outset to restate them.

In *Cali v. Philadelphia*, 406 Pa. 290, 177 A. 2d 824 (1962), the Court quoting from *Commonwealth ex rel. Truscott v. Philadelphia*, 380 Pa. 367, 111 A. 2d 136, said (pages 295-296) : " 'We start with the well-settled principle that municipalities are not sovereigns; they have no original or fundamental power of legislation; they have the power to enact only those ordinances which are authorized by the Constitution or by an enabling act of [the] legislature: Allentown School District Mercantile Tax Case, 370 Pa. 161, 171, 87 A. 2d 480; Genkinger v. New Castle, 368 Pa. 547, 84 A. 2d 303; 1 Dillon on Municipal Corporations, 5th Ed. 449.' "

In *Colligan Zoning Case*, 401 Pa. 125, 162 A. 2d 652 (1960), the Court, quoting from *Medinger Appeal*, 377 Pa. 217, 104 A. 2d 118, and *Lord Appeal*, 368 Pa. 121, 81 A. 2d 533, said (page 131) : ". . . ' ". . . an owner of property is still entitled in Pennsylvania to certain unalienable constitutional rights of liberty and property. These include a right to use his own home in any way he desires, provided he does not (1) violate any provision of the Federal or State Constitutions; or (2) create a nuisance; or (3) violate any covenant, restriction or easement; or (4) violate any laws or zoning or police regulations which are constitutional. It is now well settled that zoning acts and ordinances passed under them are valid and constitutional as structural or general legislation whenever they are necessary for the preservation of public health, safety, morals or general welfare, and not unjustly discriminatory, or arbitrary, or unreasonable, or confiscatory in their application to a particular or specific piece of property: White's Appeal, 287 Pa. 259, 134 A. 409; Taylor v.

Moore, 303 Pa. 469, 154 A. 799; Kline v. Harrisburg, 362 Pa. 438, 451, 68 A. 2d 182; Jennings' Appeal, 330 Pa. 154, 198 A. 621; Ward's Appeal, 289 Pa. 458, 137 A. 630; Bryan v. City of Chester, 212 Pa. 259, 61 A. 894; Taylor v. Haverford Township, 299 Pa. 402, 149 A. 639; Perrin's Appeal, 305 Pa. 42, 48, 156 A. 305; Village of Euclid v. Ambler Realty Co., 272 U. S. 365, 47 S. Ct. 114; Penna. Coal Co. v. Mahon, 260 U.S. 393, 43 S. Ct. 158; St. Louis Poster Advertising Co. v. St. Louis, 249 U. S. 269, 39 S. Ct. 274; Eubank v. Richmond, 226 U. S. 137, 33 S. Ct. 76." ' "

Zoning ordinances are presumptively constitutional and valid, but " 'Restrictions imposed by zoning ordinances are, however, in derogation of the common law and (at times) of the liberties, rights and privileges guaranteed by the Constitution of the United States and the Constitution of Pennsylvania and therefore must be strictly construed: Lukens v. Zoning Board of Adjustment, 367 Pa. 608, 80 A. 2d 765; Kline v. Harrisburg, 362 Pa. 438, 451, 68 A. 2d 182:' " *Medinger Appeal*, 377 Pa., supra, page 221.

With these general principles in mind we turn to The Borough Code which applies, inter alia, to the Borough of Media. The Act of July 10, 1947, P. L. 1621, §93, amended The Borough Code of May 4, 1927, P. L. 519, by adding Article XXXIII.* This Article is entitled "Zoning". Section 3301 of this Article pertinently provides: "For the purpose of *promoting health, safety, morals or the general welfare*** councils of boroughs are hereby empowered to regulate and restrict the height, number of stories, and size of buildings and other structures, . . . the size of yards, courts and other open spaces . . . and the location and use of buildings, structures, and land for trade, industry, residence or

---

* 53 PS §48301 et seq.

** Italics throughout, ours.

other purposes, and may also establish and maintain building lines and set back building lines upon any or all public streets."

That part of §3301 which authorizes Councils of Boroughs to regulate and restrict the height, number of stories, sizes of buildings and other structures, and the open spaces and set-back lines required, is reasonably necessary for the health and general welfare of the community and is therefore valid and constitutional.

One of appellant's important contentions is that the amendatory ordinance of September 4, 1958 was invalid, because the Borough Council did not adopt it "in accordance with a comprehensive plan . . ." as required by Article XXXIII, §3303 of The Borough Code. That Section is as follows: "Section 3303—*Purpose in view—Such regulations shall* be made *in accordance with a comprehensive plan,* and designed to lessen congestion in the streets, to secure safety from fire panic and other dangers, to promote health and the general welfare, to provide adequate light and air, to prevent the overcrowding of land, to avoid undue concentration of population, to facilitate the adequate provision of transportation, water, sewerage, schools, parks, and other public requirements. Such regulations shall be made with reasonable consideration, among other things, to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout the borough."

This section, which is denominated "Purpose in view", provides *for regulations which shall be made in accordance with a comprehensive plan.* It is a hodge-podge which attempts to be "all things to all men"; it lays down no clear or definite standard; it is merely a compendium of overlapping inconsistencies and con-

flicts, which produce only ambiguity and confusion. I note, parenthetically, that this section refers to nearly everything of importance or value except to the basic, fundamental rights of property which are guaranteed by the Constitution of Pennsylvania and the Constitution of the United States. I would hold this section to be meaningless surplusage, or so vague, indefinite, conflicting and confusing as to be invalid and unconstitutional: *Joseph Burstyn, Inc. v. Wilson,* 343 U. S. 495; *Hallmark Productions, Inc. v. Carroll,* 384 Pa. 348, 356, 121 A. 2d 584; *Murray v. Philadelphia,* 364 Pa. 157, 176, 71 A. 2d 280; *Willcox v. Penn Mutual Life Ins. Co.,* 357 Pa. 581, 595, 55 A. 2d 521; *Miller v. Belmont Packing & Rubber Co.,* 268 Pa. 51, 63, 110 A. 802. For this reason, irrespective of whether a comprehensive plan had ever been formulated or adopted (as to which the record is silent), the Borough Council's failure to adopt *regulations* in accordance therewith, would be immaterial and would not invalidate the ordinance or aid appellant.

I also note that The Borough Code, in §3302, contains powers, procedures and directions for Borough Councils in connection with zoning which, in their general provisions, are valid grants of zoning power.

That brings us to the principal and very important question of whether appellant has been validly deprived of any of its property rights which are ordained and guaranteed by the Constitution of this Commonwealth and by the Constitution of the United States, namely, the right to own and use one's property in any manner desired, provided it does not injure another's property or injuriously affect the public health, safety, morals, and general welfare.

Nearly everyone in Pennsylvania, and we assume in our entire Country, believes in planning* and nearly

* Planning is not, as some zealous advocates believe, something new. These proponents talk and act as if it were something as

everyone would like to have a city, a township, borough, and a community therein, which combines the attractive and the well ordered, with the prosperous and the utilitarian. For the law to permit uncovered garbage to be left on a lawn, or a noisy, smoky industrial plant, or a pigsty to be erected in a completely residential suburban community, or to permit any other acts which seriously endanger health or safety, would shock everyone. However, it seems to me that the majority Opinion in this case, like part of the Opinion in *Eves v. Zoning Board of Adjustment*, 401 Pa. 211, 164 A. 2d 7, instead of reducing or eliminating, has increased the confusion which exists in the field of zoning. The main reason for this, I believe, is because too many Courts and too many legislative bodies and zoning commissions and boards have ignored or forgotten the Constitution, which, in spite of many present-day critics, has often been proclaimed by great world leaders as the most wonderful document ever written by mankind in the last 1900 years. The Federal Constitution in the 5th (and similarly in the 14th) Amendment provides : "No person shall . . . be deprived of life, liberty or property without due process of law." The Constitution of Pennsylvania provides in Article I, §1—"All men . . . have certain inherent and indefeasible rights, among which are those of enjoying and defending life

novel as the science of space and, they as wise as Solomon. Planning is as old as the hills. Hannibal, Alexander the Great, Genghis Khan, Napoleon. Wellington, Washington, Grant, Lee. Eisenhower, and nearly all the great Generals of history planned their campaigns and battles. Business men plan in advance their inventories and future business; every great doctor plans a serious operation; every able lawyer plans the trial or argument of important cases; housewives plan their meals and their day. Nevertheless, planning has become a fetish which in too many instances is carried to extremes, with little or no consideration given to the constitutionally ordained rights of property owners, or to the possible lack of judgment and vision of the temporary planners.

and liberty, of acquiring, possessing and protecting property . . . ." Article I, §10 provides: ". . . nor shall private property be taken or applied to public use, without authority of law and without just compensation being first made or secured." The ownership and possession of private property is of little value unless the owner can use it, hence the acquiring, possession and protection of private property necessarily includes its lawful use and if a public authority wishes to deprive an owner of his lawful use it must pay just compensation therefor. See in addition to the Constitutional provisions supra, the cases cited herein.

The principle of the unalienable right of private property is centuries old and underlies several articles of Magna Carta. The right of private property, together with the right of freedom of speech, freedom of religion, and freedom of the press are the hallmarks of western civilization. These Basic Freedoms constitute the fundamental differences which distinguish—and create the great unpassable gulf which divides—western civilization and free peoples, from Communists and from other peoples who are ruled by a despotic dictator. The historical origin and development of our Country, our Birthright and Heritage of Freedom and the (so-called) inalienable fundamental rights, privileges and immunities guaranteed by our Constitution are too often forgotten today. The natural or zealous desire of many planners, zoning commissioners, zoning boards and legislative bodies to protect or improve or develop their community so as to make it peaceful and prosperous, beautiful and economically utilitarian, and to conserve the property values as well as the "tone" of that community is—when reasonably applied—highly commendable. But they should remember that property owners have certain basic fundamental inalienable rights of property which were obtained only after centuries of hardship and struggle against Sovereign Gov-

ernment, and neither worthy objectives nor highly desirable goals can validly curtail, abolish or destroy these Constitutionally guaranteed property rights. As this Court said in *Lord Appeal*, 368 Pa. 121, 81 A. 2d 533, quoting from *White's Appeal*, 287 Pa. 259, at page 130: " '. . . all property is held in subordination to the right of its reasonable regulation by the government clearly necessary to preserve the health, safety or morals [or general welfare] of the people . . . . There is one matter that is quite certain, the power to thus regulate does not extend to an arbitrary, unnecessary or unreasonable intermeddling with the private ownership of property, even though such acts be labeled for the preservation of health, safety and general welfare. . . . While such regulations may not physically take the property, they do so regulate its use as to deprive the owner of a substantial right therein without compensation. "We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change": Pennsylvania Coal Co. v. Mahon, 260 U. S. 393, 416. . . . "To secure their property was one of the great ends for which men entered society. The right to acquire and own property, and to deal with it and use it as the owner chooses so long as the use harms nobody, is a natural right. It does not owe its origin to constitutions. It existed before them. It is a part of the citizen's natural liberty,—an expression of his freedom,—guaranteed as inviolate by every American bill of rights": Spann v. Dallas, 111 Tex. 350, 235 S.W. 513 . . . . Where a statute or ordinance interferes with the use and control of property without rational relation to public safety, health, morals or general welfare, or is a palpable invasion of rights secured by the fundamental law, the enactment cannot be sustained as a legitimate exercise of police power . . . .' " See to the

same effect *Griggs v. Allegheny County,* 369 U. S. 84
(1962) ; see also same case 402 Pa. page 420; *United
States v. Causby,* 328 U. S. 256; *Miller v. Beaver Falls,*
368 Pa. 189, 82 A. 2d 34.

From the leading cases of *Village of Euclid v. Am-
bler Realty Co.,* 272 U. S. 365, and *White's Appeal,* 287
Pa., supra,—through *Lord Appeal,* 368 Pa., supra;
*Rolling Green Golf Club Case,* 374 Pa. 450, 97 A. 2d
523; *Medinger Appeal,* 377 Pa., supra; *Volpe Appeal,*
384 Pa. 374, 121 A. 2d 97; *Schmalz v. Buckingham
Township Zoning Board,* 389 Pa. 295, 132 A. 2d 233;
*Archbishop O'Hara's Appeal,* 389 Pa. 35, 131 A. 2d 587;
*Colligan Zoning Case,* 401 Pa. 125, 131, 162 A. 2d 652
(1960)—the standards and tests for valid and consti-
tutional zoning were firmly established in the law of
Pennsylvania and were adhered to in a myriad deci-
sions. The standards as therein *interpreted* could be
thus expressed in a nutshell—an Act or a zoning Ordi-
nance was valid and constitutional provided it was
clearly or reasonably necessary for the health or safety
or morals, and also in connection with the general wel-
fare of the community. These cases and the standards
laid down and thus interpreted were never expressly
overruled, but they were effectually changed by a new
concept of zoning, and realistically a new standard for
zoning in *Bilbar Construction Co. v. Easttown Town-
ship Board of Adjustment,* 393 Pa. 62, 141 A. 2d 851
(1958), and its companion case *Best v. Zoning Board
of Adjustment,* 393 Pa. 106, 141 A. 2d 606 (1958). The
change can be thus expressed: Although some decisions
made no reference to general welfare, almost all the
decisions expressed the required standard that the
statute or ordinance must be clearly or reasonably nec-
essary for public safety, health, morals, *or* general wel-
fare. Notwithstanding the word "or", the Court in all
of the cases *until Bilbar and Best* (1958) devoted near-
ly their entire opinion to discussing and determining

whether the Act or ordinance in question was necessary for the health and/or safety of the particular community, (township, borough or city, as the case might be), with only a sentence or two dealing with the secondary and connected question of general welfare. Moreover, even in *Bilbar* the Court said (page 72): "Although some of our recent cases appear to have ignored 'general welfare' as a consideration in adjudging whether the police power has been constitutionally exercised in a given instance, it is not open to serious question that it is one of the important elements to be reckoned with in any such inquiry." The emphasis in all of these cases was, I repeat, on the question of health and/or safety, with only slight consideration or weight given to the secondary but connected "general welfare". The basic reasons for this were two-fold: (1) the words "general welfare" were ejusdem generis with health and safety and morals, and (2) the Court's conviction that the constitutionally ordained and guaranteed rights of private property could be restricted or curtailed by government* in pursuance and application of the police power which government impliedly but necessarily possessed, but only to the extent of Acts and measures reasonably necessary for health and/or safety and/or morals, and even then only if also reasonably necessary for general welfare.

As the (majority of the) Court said in *Best v. Zoning Board of Adjustment,* 393 Pa., supra (page 110):

---

* A large or small landowner (or builder) can validly and Constitutionally restrict or zone his land by a restrictive covenant in a deed or deeds, and landowners can validly and Constitutionally restrict or zone land by deeds or by written agreements containing covenants which run with the land, but Government cannot Constitutionally do so except by taking and paying just compensation for the property whose lawful use they have partially taken or destroyed. Cf. *Griggs v. Allegheny County,* 369 U. S. 84; see also same case, 402 Pa. page 420.

"The authority of the legislature to permit the zoning of land is derived, as is all legislative authority, from the governmental power of the Commonwealth—the 'police power.' . . . Hence . . . considerations of the *general welfare alone* support the constitutionality of zoning ordinances. The broad scope of the concept of general welfare is illustrated by the decision of the United States Supreme Court in Berman v. Parker,* 348 U. S. 26 (1954)."**

In *Bilbar* and *Best,* health and safety were either de-emphasized or obliterated, and general welfare was made not only the dominant and paramount test but the *sole* test of constitutionality. In other words, *Bilbar* and *Best* changed not the language of the standard but its meaning. It substituted and emphasized a new standard which embodied not health or safety under and by virtue of *limited* police power of government but erected in lieu thereof a new American doctrine of absolute and *unlimited* police power, and its derivative child known as general welfare. Absolute and unlimited police power is one of the twin pillars*** on which Communism and every totalitarian regime and every

---

* This was not a zoning case. In *Berman* the Governmental Authority owned the land (after it took it by eminent domain and paid just compensation for it) and then redeveloped and beautified *its own* property. Why shouldn't any landowner have that right?

** This Court then went on to add that "aesthetic" values—contrary to prior decisions of this Court—*White's Appeal*, 287 Pa., supra, *Archbishop O'Hara's Appeal*, 389 Pa., supra, *Medinger Appeal*, 377 Pa., supra, and cases cited therein—may be considered as one of the factors in determining the question of general welfare. It is difficult to imagine a more variable, uncertain fluctuating standard than "aesthetic" value. In many instances, scarcely a dozen people can agree on what is or is not aesthetic—it depends entirely on each individual's artistic tastes or personal predilections, and even these views, like the views on modernistic paintings, have only "a fleeting moment's duration".

*** The other pillar is military might.

dictatorship is based, maintained and kept in power. It is a doctrine and a power which is repugnant to our Birthright of Liberty, our Constitution, our traditions and our American Way of Life.

In this harried hurried world of today there is too little time for deep thought and mature reflection, with the result that views or policies are often adopted with little or no realization of their likely long-term consequences. It is sometimes forgotten that ours is a government of checks and balances; it is a republican* form of government with three co-equal independent yet co-ordinate branches of government, none of which possess absolute unlimited power. The powers of each branch—the Executive, the Legislative, and the Judicial—are clearly and indisputably limited and circumscribed by the Constitution. To repeat, neither the power of Government nor the right of private property, nor freedom of speech or press, nor any of the freedoms which are ordained in the Constitution are absolute: *Wortex Mills v. Textile Workers U. of A.,* 369 Pa. 359, 85 A. 2d 851, and a dozen cases cited therein.

In *Nashville C. & St. L. Ry. v. Walters,* 294 U. S. 405, Mr. Justice BRANDEIS, speaking for the Court, said (p. 415), "The police power is subject to the constitutional limitation that it may not be exerted arbitrarily or unreasonably.", [citing with approval *Pennsylvania Coal Co. v. Mahon,* 260 U. S. 393, where the Court held that the Kohler Act of Pennsylvania (May 27, 1921)

---

* Many times daily and weekly speakers and writers refer to our form of government as a democracy. This error arose from the slogan devised by President Woodrow Wilson in connection with the first world war, "Make the world safe for democracy." This appealing slogan has been misinterpreted or (unwittingly) distorted ever since. Our American form of government, I repeat, is in actuality and under the language of the Constitution, republican form of government—our American system or way of life is democratic.

which forbade the mining of anthracite coal under streets in such a way as to cause a subsidence of any structure used as a human habitation, was an unconstitutional exercise of the police power].

In *Pennsylvania Coal Co. v. Mahon,* supra, Mr. Justice HOLMES, speaking for the Court, said (pp. 413, 414, 415) : "As applied to this case the statute is admitted to destroy previously existing rights of property and contract. The question is whether the police power can be stretched so far.

"Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized, some values are enjoyed under an implied limitation and must yield to the police power. But obviously the implied limitation must have its limits, or the contract and due process clauses are gone. One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act. So the question depends upon the particular facts . . . .

"It is our opinion that the act cannot be sustained as an exercise of the police power, so far as it affects the mining of coal under streets or cities in places where the right to mine such coal has been reserved. As said in a Pennsylvania case, 'For practical purposes, the right to coal consists in the right to mine it.' . . .

". . . The protection of private property in the Fifth Amendment presupposes that it is wanted for public use, but provides that it shall not be taken for such use without compensation. A similar assumption is made in the decisions upon the Fourteenth Amendment. Hairston v. Danville & Western Ry. Co., 208 U. S. 598, 605. When this seemingly absolute protection is found

to be qualified by the police power, the natural tendency of human nature is to extend the qualification more and more until at last private property disappears. But that cannot be accomplished in this way under the Constitution of the United States."

In *Panhandle E. P. L. Co. v. State Highway Commission,* 294 U. S. 613, the Court, after quoting with approval from *Pennsylvania Coal Co. v. Mahon,* supra, said (page 622) : "The police power of a State, while not susceptible of definition with circumstantial precision, must be exercised within a limited ambit *and is subordinate to constitutional limitations.* It springs from the obligation of the State to protect its citizens and provide for the safety and good order of society. Under it there is no unrestricted authority to accomplish whatever the public may presently desire. It is the governmental power of self protection, and permits reasonable regulation of rights and property in particulars essential to the preservation of the community from injury. New York & N. E. R. Co. v. Bristol, 151 U.S. 556."

In *Commonwealth v. Zasloff,* 338 Pa. 457, 13 A. 2d 67, the Court, speaking through Mr. Justice, later Chief Justice, HORACE STERN, said (page 460) : "But in these, *as in all cases, the police power is not unrestricted; its exercise, like that of other governmental powers, is subject to constitutional limitations and judicial review, otherwise we would have an absolute instead of a constitutional scheme of government."*

Furthermore, the doctrine of police power and general welfare as *absolute and unlimited* was utterly rejected and completely demolished by the recent decision of the Supreme Court of the United States in *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U. S. 579.

If general welfare were *unlimited,* virtually every right of liberty, every right of property, and every right to a free press, and to due process, as well as all

the other fundamental rights which are ordained in and guaranteed by the Constitution could be superseded, abrogated and extinguished by "general welfare".

If general welfare were all inclusive and all powerful, as the majority held in *Best* and in *Bilbar*, supra, it would have been totally unnecessary to include and ordain in our Constitutions any of the provisions guaranteeing and protecting property rights or due process or any human rights including, inter alia, freedom of speech, freedom of religion, and freedom of the press. The Constitution would just have given the Executive or the Congress absolute unlimited omnipotent unrestricted police power or its derivative general welfare. Neither the Federal nor the State Constitution gives the Executive or the Congress or any Legislature the absolute and unlimited power to do anything and everything either or both may believe is for the "general welfare", which is the underlying reason for all laws and (usually) for all executive actions; the Constitution gives them and each of them certain definite, prescribed, circumscribed and limited powers "in order to promote the general welfare." I repeat, if general welfare were absolute, unlimited and omnipotent it would have been not only surplusage but meaningless to ordain and guarantee in the Constitutions certain enumerated, fundamental basic rights of liberty and property and due process.

Thoughtful analysis will further demonstrate that even the police power is *limited*. This is illustrated by a myriad cases which limit the government's police power in many other fields involving health or safety or human rights or property rights (see, inter alia, *Commonwealth v. Zasloff*, 338 Pa., supra, and cases cited therein; *F. K. Market House Co., Inc. v. Reading*, 310 Pa. 493, 165 A. 398, and cases cited therein; *Hertz Drivurself Stations, Inc. v. Siggins*, 359 Pa. 25, 58 A.

2d 464, and cases cited therein; *Commonwealth ex rel. Woodside v. Sun Ray Drug Co.*, 383 Pa. 1, 116 A. 2d 833). In the *Sun Ray Drug Co.* case, which involved the regulation of milk, the Court said (pages 10-11) : "The standard to be applied in this type of case was well stated by Mr. Chief Justice STERN in the recent case of Cott Beverage Corporation v. Horst, 380 Pa. 113 (1955), 110 A. 2d 405. In that case the Chief Justice, quoting from Gambone v. Commonwealth, 375 Pa. 547, 101 A. 2d 634, stated at p. 118: ' ". . . By a host of authorities, Federal and State alike, it has been held that *a law which purports to be an exercise of the police power must not be unreasonable, unduly oppressive, or patently beyond the necessities of the case,* and the means which it employs must have a real and substantial relation to the objects sought to be attained. Under the guise of protecting the public interests, the legislature may not arbitrarily interfere with private business or impose unusual or unnecessary restrictions upon lawful occupations. The question whether any particular statutory provision is so related to the public good *and so reasonable in the means it prescribes as to justify the exercise of the police power,* is one for the judgment, in the first instance, of the law-making branch of the government, but its final determination is for the courts." '."

Consider another example. Where a defendant who has perpetrated the vilest and most brutal murder conceivable, is caught red-handed in his crime—even though he has committed a dozen similar crimes— Courts do not invoke or apply the doctrine of unlimited police power or its derivative, general welfare, to aid and protect the safety and welfare of the community. Instead, the Courts invoke and apply due process and every other Constitutional right which is ordained to protect a person accused of a crime. What justification can there be, logically, justly and Constitution-

ally, for the adoption of a double standard—one for the Constitutionally ordained rights of liberty and due process, and exactly the opposite standard for the protection of Constitutionally ordained rights of property.

I regret to say* that the majority Opinion in this case, together with the *Bilbar* and *Best* Opinions, increases and expands the confusion which is so widespread in the difficult field of zoning. It enables several commissioners or planners—appointed or elected for a short time—to deprive every American homeowner in that community of his Constitutionally guaranteed rights of property; and it substitutes for these Constitutional rights—without any limitation or clear and Constitutional standard—their individual ideas or personal predilections of what (is ephemerally aesthetic and what) they believe is best for the general welfare of that township, borough or community, and of every home, building and property therein. I know full well that zoning is presently very popular and that the protection of Constitutionally ordained rights of property is very unpopular. But the Constitution is not a weathervane which changes and turns with each wind that blows; it is a rock of Gibraltar which was built to withstand even hurricane winds.

To summarize, I would reaffirm the principles laid down and *interpreted* in *Lord, Rolling Green, Medinger, Volpe, Schmalz, Archbishop O'Hara, Colligan,* and cases cited with approval therein. I would hold (a) that aesthetic values are not a factor in the consideration of the validity or constitutionality of a zoning Act or ordinance, and (b) that "general welfare" *alone* is *not* sufficient to validate or constitutionalize a zoning Act or ordinance or regulation. To this extent I would disapprove *Bilbar* and *Best,* supra. I

---

* And I say this without intending any disrespect.

would also reaffirm the following *general* principles or standards:

1. A councilmanic body can exercise only the zoning powers which are authorized by the Legislature, and the Legislature can grant only those zoning powers which are constitutionally permitted. 2. Certain and definite and valid standards for zoning must be prescribed in the Legislative Act and in the zoning ordinances. 3. Zoning classifications are largely within the sound discretion and judgment of the pertinent legislative or zoning body, subject to the provisions and limitations of the Constitution. Health and safety and morals and also, in connection with general welfare, the nature and character of the neighborhood and the district, are important factors which must be considered by the zoning authorities. 4. Unless the Legislature or the legislative body clearly otherwise provides, a planning commission is often wise but is not necessary and a township or borough or city may adopt or modify or reject any comprehensive or master plan which is prepared by a planning commission. 5. A comprehensive plan is ordinarily separate and distinct from an ordinance but it is possible for an ordinance in and of itself to be a comprehensive plan, unless the Legislature or the legislative body clearly otherwise provides. 6. A zoning ordinance may be amended, supplemented, changed, modified or repealed—in the sound discretion of the legislative body and in accordance with statutory and other pertinent legal and Constitutional requirements—as conditions or changing circumstances may require. 7. Public hearings and public approval are often wise, but are mandatory only when required by the Legislature or by the Legislative body; and if hearings are held, the approval or disapproval expressed thereat is not binding upon the legislative body, unless the Legislature or the legislative body clearly otherwise provides. 8. Spot zoning is unconstitutional.

The aforesaid principles and the *general* standards above enunciated would clear up some of the confusion in the field of zoning and would bring us back home to the Constitution and our American Heritage of Freedom.

MR. JUSTICE MUSMANNO and Mr. Justice O'BRIEN join in this concurring opinion.