550 A.2d 1355

Whitpain Township Board of Supervisors *v.* Whitpain Township Zoning Hearing Board/Wings Field Associates, a Pennsylvania Limited Partnership *v.* The Whitpain Township Zoning Hearing Board and Whitpain Township Board of Supervisors. Wings Field Associates, a Pennsylvania Limited Partnership, Appellant.

Wings Field Associates, a Pennsylvania Limited Partnership *v.* The Whitpain Township Zoning Hearing Board and Whitpain Township Board of Supervisors. Whitpain Township Board of Supervisors, Appellant.

Whitpain Township Board of Supervisors, Appellant *v.* Whitpain Township Zoning Hearing Board, Appellee.

Argued December 15, 1987, before Judges CRAIG and DOYLE, and Senior Judge NARICK, sitting as a panel of three.

*Robert S. Ryan, Drinker, Biddle & Reath,* with him, *Frank W. Jenkins* and *Stephen P. Imms, Jr., Jenkins, Tarquini & Jenkins,* for appellant/appellee, Wings Field Associates.

*J. Peirce Anderson,* Township Solicitor, for appellee/appellant, Whitpain Township Board of Supervisors.

OPINION BY JUDGE DOYLE, December 2, 1988:

These three consolidated appeals all arise out of the attempts of Wings Field Associates (Wings) to modernize and expand its airport, Wings Field, located in Whitpain Township (Township), in Montgomery County. Wings Field was originally founded in 1929 as a private club for airplane owners and pilots, and was located upon a 134.5 acre tract. By the 1940's Wings Field had developed to include a commercial air taxi and charter service, a flight school, aircraft maintenance facilities, various aviation related businesses and the Philadelphia Aviation Country Club (Club). As of 1950, Wings Field's facilities consisted of four hangars, a barn maintenance hangar, the club building, a small cottage and a 2600 foot runway. The runway ran, and still runs, from southwest to northeast. In 1950, the Township zoned Wings Field and the property around it R-1 residential, making the airport a preexisting non-conforming use.[1]

---

[1] The zoning of the property was changed to R-5 residential sometime in the second half of 1984, after Wings had filed its per-

Wings Field was further expanded in 1955 and 1967, when the Whitpain Township Zoning Hearing Board (Board) allowed the airport's owner to construct a hangar on each occasion. In 1972, Wings Field was purchased by Wings' immediate predecessor-in-interest, Blue Bell Associates (Blue Bell), which began acquiring property contiguous to the airport. Among its purchases Blue Bell acquired a 21.4 acre tract of land which abutted the northeastern portion of Wings Field.

In January 1977, Pennsylvania Aviation, Inc. (Aviation) instituted an airline shuttle service, known as Wings Airways (Airways). Aviation's presence at Wings Field necessitated further expansion of the airport. In 1977, Blue Bell constructed a hangar with twelve aircraft spaces, and in 1981 erected a terminal building housing passenger, administrative and other airport facilities. Aviation's activities have increased since 1977 from 5,157 operations and 13,468 passengers to 16,500 operations and 75,000 passengers by 1984, and constituted the bulk of activities at Wings Field. By 1984 Wings Airways had twenty-six scheduled flights between Wings Field and Philadelphia International Airport.[2]

Wings purchased the airport from Blue Bell in 1983. By 1984, the airport facilities consisted of the runway, seven hangars with space for fifty-two airplanes, tiedown areas for forty-five additional aircraft, four maintenance and fifteen transient tiedowns, a barn maintenance hangar, an administration building, a terminal building, the Club's facilities and miscellaneous

---

mit applications. The R-5 zone under the Township zoning ordinance generally permits a higher density of residential units than R-1.

[2] Prior to 1984, Wings Airways flew at various times to Dover and Millville, New Jersey; Allentown, Pennsylvania and John F. Kennedy Airport in New York City.

other structures and uses, including a cottage and 409 parking spaces. Further, the facilities covered 209.9 acres of which 117.6 acres were open space. The aircraft using Wings Field in 1984 were those of the general aviation class, *i.e.*, single and multi-engine aircraft under 12,500 pounds.

After reviewing operations at Wings Field, Wings decided that the airport should be further expanded. This decision was based on the following projections by Wings: that Aviation's activities would increase to 17,500 operations and 85,000 passengers by 1989; that general aviation use of Wings Field would expand from 26,000 operations in 1984 to 30,500 operations in 1989; and, that air taxi and charter flights would rise from 2,000 operations in 1984 to 2,500 operations in 1989.

Consequently, in late 1984, Wings filed an application with the Board requesting that it be permitted: (a) to construct a new 4,800 square foot passenger terminal to house the Wings Airways operations and a "buffeteria" to serve food to passengers and airport employees; (b) to construct a 318 space parking lot to be used by Aviation in addition to a 146 space long-term parking lot; (c) to demolish existing hangars 3, 4, and 6, and replace them with eight new hangars and a maintenance hangar (the new hangars would increase the number of hangar spaces from 52 to 79); (d) to add additional tiedown areas, increasing the number of tiedowns from sixty-four to eighty-three; (e) to construct a three-story, 49,500 square foot, "spec" office/hangar to be totally tenant-occupied with hangar space for five tenant-owned aircraft and 190 parking spaces in connection with this building; (f) to add parking spaces including, *inter alia*, thirty-two Club parking spaces, sixteen visitor parking spaces, eleven employee parking spaces adjacent to the maintenance hangar, and forty-eight employer spaces in other areas; (g) to convert the existing

passenger terminal into a flight school and pilot's lounge; (h) to convert the existing maintenance hangar into a storage hangar; and (i) to demolish the cottage.

Wings also filed a second application, which would allow it to lengthen the existing runway by 1200 feet, from 2600 feet to 3800 feet at its northeastern end, into the property Blue Bell had acquired in 1974. The runway could not be expanded at its southeastern end because of its extremely close proximity to a township road and because of restrictive covenants entered into between previous owners of the airport.

After over a year of hearings, the Board granted Wings' first application in all respects, except for the "spec" office/hangar. As to the second application, the Board found that because of the statutory "clear zone"[3] which mandates that certain portions of Wings' property at the end of the runway not be used for residential purposes, a hardship was created upon the property. The Board further found that a runway extension of 600 feet would not be detrimental to the public interest.

Both Wings and the Township appealed to the Court of Common Pleas of Montgomery County. The common pleas court, without taking additional evidence, affirmed the Board's order, except that it modified the Board's order by allowing Wings to expand the runway by 1,000 feet, rather than 600 feet. This 1,000 feet represents the full length of the "clear zone." Both parties have appealed to this Court.[4]

---

[3] Section 1 of the Act of July 27, 1953 (Act) P.L. 641, *as amended*, 2 P.S. §1458, requires that airports have an aircraft approach area which extends outward from the end of the runway 1,000 feet and be 300 feet in width. Section 2 of the Act, 2 P.S. §1459, states that any person erecting or maintaining buildings or any other structure in the approach zone is subject to fines and imprisonment.

[4] Our scope of review in a zoning case, when the common pleas court takes no additional evidence, is limited to determining

The Township's first contention is that the addition of Wings Airways commuter services in 1977 constituted the addition of an illegal use.[5] We disagree. Generally, a landowner cannot change or establish a use different in nature from what was contemplated as the nonconforming use. *Mignatti Appeal*, 403 Pa. 144, 168 A.2d 567 (1961). In order to decide whether an application involves a new use or an existing one, "[w]e must look to the applicable zoning ordinance's structure as our chief guide with respect to how uses are categorized for the particular municipality." *Gustin v. Zoning Hearing Board of Sayre Borough*, 55 Pa. Commonwealth Ct. 410, 412, 423 A.2d 1085, 1086 (1980). In this case, however, the Township has neither differentiated between types of airports nor even zoned for an airport. Consequently, we must determine whether the use of the airport by Wings Airways is so different in magnitude or kind as to amount to a change in use. *Mignatti.*

We agree with the Board that Wings Field in 1950 was not a "country club for pilots" as the Township contends, but rather a local full-service airport with a number of aviation activities and aviation related businesses.[6] The airport has grown significantly since that

whether the zoning hearing board committed an error of law or abused its discretion. *Valley View Civic Ass'n v. Zoning Board of Adjustment*, 501 Pa. 550, 462 A.2d 637 (1983). A zoning hearing board abuses its discretion when its factual findings are unsupported by substantial evidence. *Id.*

[5] We note that the Township had prior opportunities to raise this issue to the Board but chose not do so and has seen fit to raise it in this litigation for the first time.

[6] A partial list of the businesses which have operated at Wings Field include: air taxis, a mortuary, a flight school, aerial photographers, an air ambulance and rescue service, helicopter companies, balloon shops, various avionics shops, an airplane advertising business, an aviation fuel business, and plane and car rental agencies. Moreover, United Airlines operated airline service out of Wings Field during the 1930's.

time, and that growth has been sanctioned by the Township zoning authorities. The shuttle service provided by Airways is nothing more than a scheduled air taxi, an aviation activity which has existed at Wings Field since prior to 1950. Given the facts that the planes used by Airways are of the same type that now use the airport, the shuttle's similarity to a use presently at the airport, and Airways' small number of flights, the Board did not err in dismissing this argument.

The next argument raised by the Township is that Wings' expansion of its fixed base operations (excluding the "spec" office/hangar) was unreasonable. In Pennsylvania, "[t]he right to expand a nonconforming use to provide for the natural expansion and accommodation of increased trade 'is a constitutional right protected by the due process clause.' " *Jenkintown Towing Service v. Zoning Hearing Board of Upper Moreland Township,* 67 Pa. Commonwealth Ct. 183, 186, 446 A.2d 716, 718 (1982) (quoting *Silver v. Zoning Hearing Board of Adjustment,* 435 Pa. 99, 102, 255 A.2d 506, 507 (1969)). Limitations on this right occur when the expansion is inconsistent with the public interest, *Tuckfelt v. Zoning Board of Adjustment of the City of Pittsburgh,* 80 Pa. Commonwealth Ct. 496, 471 A.2d 1311 (1984), where the proposed expansion is in actuality not an expansion of the old use, but the addition of a new use, *Key Realty Co. Zoning Case,* 408 Pa. 98, 182 A.2d 187 (1962), or in order to prevent excessive expansion. *Putkowski v. City of Scranton,* 58 Pa. Commonwealth Ct. 604, 428 A.2d 743 (1981). The Township argues that the expansion is detrimental to the public interest and should have been denied by the Board. This assertion is based upon the testimony of Mr. Van Rieker, the Township planner, who testified that the airport's expansion was excessive due to the airport's location in a residential area and that the surrounding residences would be adversely af-

fected by noise and traffic generated by the expansion. Essentially, the Township argues that the Board should have given more weight to Van Rieker's testimony regarding the expansion. It is well settled, however, that when the common pleas court takes no additional evidence, questions of credibility and evidentiary weight are solely the province of the zoning hearing board, *Muse v. Zoning Hearing Board of Ben Avon Heights Borough*, 52 Pa. Commonwealth Ct. 287, 415 A.2d 1255 (1980), and the Board is free to reject, in whole or in part, the testimony of any witness. *Graham v. Zoning Hearing Board of Upper Allen Township*, 99 Pa. Commonwealth Ct. 585, 514 A.2d 236 (1986), *petition for allowance of appeal granted*, 515 Pa. 596, 528 A.2d 604 (1987). There is credible, competent testimony in the record indicating that Wings' buildings were in need of repair, and that more hangar, maintenance and parking spaces were needed to meet existing and future business needs. Therefore, we do not find the Board's credibility determinations, nor its decision to grant, in substantial part, the application to be improper.

Further, we do not find any merit in the Township's contention that because the airport has expanded by 429 percent over the square footage of the structures on the property in 1950, this expansion is *per se* unreasonable. First, each of the airport's expansions since 1950 have been allowed by the Board as necessary for Wings' business needs. Moreover, the mere fact that an expansion is sizeable does not make it unreasonable. *See Gilfillan's Permit*, 291 Pa. 358, 140 A. 136 (1927); *Miller Co., Inc.'s Zoning Appeal*, 3 Pa. Commonwealth Ct. 213, 281 A.2d 364 (1971).[7]

---

[7] The Township's contention that the Board erred by allowing expansion of the airport's fixed base facilities into the flood plain was not raised before the Board and is waived. *See Myers v. State College Zoning Hearing Board*, 108 Pa. Commonwealth Ct. 624, 530 A.2d 526 (1987).

The fourth issue, posed by the Wings' appeal is whether the Board acted properly in denying Wings' application for a "spec" office/hangar. Wings contends that the Board's finding that the office/hangar was neither required for, nor related to, Wings' unmet business needs and its further findings that the building was not compatible or consistent with Wings' expansion were unsupported by substantial evidence. Although one of Wings' witnesses, Ronald Price, testified that the office/hangar was needed to accommodate and centralize the current offices at the airport, Van Rieker testified that the building was of the type designed primarily to attract tenants, and was not a necessary or integral part of operating the airport. Van Rieker further testified that the building was fundamentally for investment purposes, would be highly obtrusive visually and would create traffic. This is sufficient to constitute substantial evidence, and the fact that Van Rieker is not an airport planner goes only to the weight of his testimony, not its competency.[8] *Commonwealth v. Manning,* 495 Pa. 652, 435 A.2d 1207 (1981).

Last, we turn to the question of the runway expansion. We begin our analysis by recognizing that a party seeking to expand nonconforming use over ground acquired *after* enactment of the zoning ordinance must meet the standards laid out in Section 912 of the Pennsylvania Municipalities Planning Code,[9] 53 P.S. §10912. *Jenkintown Towing.* Section 912's requirements may be summarized as follows: (1) the property must possess unique physical circumstances; (2) those circumstances, in combination with the zoning ordinance must cause unnecessary hardship—an unreasonable inhibition of

---

[8] Wings also argues that the "spec" office/hangar constituted an accessory use. This argument was not raised before the Board and is waived. *Myers.*

[9] Act of July 31, 1968, P.L. 805, *as amended.*

usefulness of the property; (3) the hardship must not be self-inflicted; (4) the granting of a variance must not have an adverse impact on the health, safety and welfare of the general public; and (5) the variance sought must be the minimum variance that will provide relief. *Jenkintown Towing*.

As we noted in *Jenkintown Towing*, "[t]he nonconforming use variance decisions have uniformly assumed, with little or no discussion, the existence of 'unique physical . . . conditions,' necessarily indicating that the pre-existing nonconforming use itself constitutes the physical 'circumstances' which, apart from other lot or land characteristics, make the property uniquely different from others in the district." *Id*. at 191, 446 A.2d at 720. Thus, Wings, as a nonconforming airport use, has satisfied the uniqueness requirement of Section 912. *See Bellosi v. Zoning Hearing Board of Clifton Heights Borough*, 96 Pa. Commonwealth Ct. 83, 506 A.2d 997 (1986).

Although this reason alone would be sufficient in order to satisfy the "uniqueness" requirement of Section 912(1), we feel that we need to address the Township's assertion that our decision in *West Torresdale Civic Ass'n. v. Zoning Board of Adjustment*, 99 Pa. Commonwealth Ct. 252, 513 A.2d 515 (1986), *petition for allowance of appeal granted*, 514 Pa. 651, 524 A.2d 497 (1987), stands for the proposition that the burden imposed by the "clear zone" is not unique.

In *West Torresdale* Potamkin Chevrolet leased two contiguous tracts split-zoned R-3 and R-4 from the City of Philadelphia. Because of the "clear zone" and federal regulations, residential development was prohibited. Potamkin sought a variance to allow a commercial use on the parcels, which was granted by the zoning board and affirmed by the common pleas court. This Court re-

versed, holding that Potamkin's remedy lay by way of rezoning on application to the City Council, not variance. We stated in *West Torresdale* that:

It is undisputed that the tracts leased by Potamkin cannot be utilized for the residential purposes originally intended by City Council due to the airport flight path restrictions. However, any hardship created by this condition is an inappropriate subject for a variance request since it is not caused by the physical characteristics of the subject land or the characteristics of the surrounding area, and there is nothing in the record indicating that this hardship is unique to Potamkin's land.

*Id.* at 257-58, 513 A.2d at 517.

*West Torresdale* is distinguishable, however, from this case. The hardship of the "clear zone" in this case arises because of the presence of the runway on Wings' property and the burden of the "clear zone" in this case falls only on Wings' property. In *West Torresdale,* however, the hardship of the "clear zone" was not caused by any physical circumstance of Potamkin's property, but that of a neighboring property. Thus, the hardship is unique to Wings' property.

The next requirement pertaining to the grant of a variance is that of unnecessary hardship. In order to show unnecessary hardship, a variance applicant must show either (1) the physical characteristics of the property are such that it could not in any case be used for any permitted purpose or (2) that the physical characteristics of the property are such that it can be arranged for that purpose at prohibitive expense, or (3) the characteristics of the property are such that the lot has either no value or only distress value for any purpose permitted by the ordinance. *Griffith v. Zoning Hearing Board of Exeter Township,* 109 Pa. Commonwealth Ct.

382, 531 A.2d 121 (1987). Mere economic hardship alone does not generally constitute unique hardship. *Id.* When, however, the property cannot be used as zoned, *i.e.*, residential use within the "clear zone" and the zoning ordinance effectively confiscates the property, the granting of a variance is appropriate. *Peirce v. Zoning Board of Adjustment,* 410 Pa. 262, 189 A.2d 138 (1963).

The Board found that "[t]he after-acquired premises onto which Applicant [Wings] proposes to extend its runway . . . cannot realistically or reasonably be used for residential development." This finding is amply supported by the evidence as neither Wings' witnesses Salwen, Mazer or Westrum, nor Township witnesses Van Rieker or Pidcock, testified that the after-acquired property, especially those portions in the approach areas, should be developed for residential use. All the witnesses agree that the property proposed for the runway expansion was surrounded by a flood plain and alluvial soil and that the "clear zone" ran down the center of the tract. The testimony also showed that the tract lacked good drainage which precludes the use of a septic tank sewage system and that any other sewage system would be costly to install. Every development expert called in this case to testify agreed that the after-acquired property's best use was as an airport use, and Wings' development witnesses stated that the tract could only be used as an airport. Findings such as those made here concerning the potential development of the property have been held by our Supreme Court, when supported by substantial evidence, to support the grant of a variance. *See Valley View Civic Ass'n. v. Zoning Board of Adjustment,* 501 Pa. 550, 462 A.2d 637 (1983). Witness Mazer stated, "I could not imagine any prudent buyer buying a home in that location." This opinion was based on the fact that the after-acquired property *is* in

close proximity to Wings' runway. It is true beyond peradventure the noise in any home constructed on the after-acquired property would be at best irritating and at worst deafening. Thus, any development of the property is effectively precluded by Wings' nonconforming use next door. The Board also concluded, however, that the "[a]pplicant failed to establish a legal hardship upon the after-acquired premises to the extent of the remainder of the proposed runway extension." Since Wings has satisfied its burden of showing unique physical circumstances and of showing that the ground cannot be developed in conformity with the ordinance, the Board's conclusion is erroneous. Neither the fact that Blue Bell had submitted plans showing residential development of the after-acquired property nor the fact that some houses could be constructed at some locations on the property precludes a finding that the property could not be used as zoned. *Valley View; Peirce.*[10]

The third requirement is that the variance seeker's hardship not be self-inflicted. The Township argues that the hardship in this case occurs because Wings allows aircraft to overfly the after-acquired property, and that if Wings did not allow such overflights, there would be no hardship. We note that the particular physical configuration of the runway at Wings predated the Township's zoning ordinance. Thus, the Township basi-

---

[10] The Township also urges the rather unique contention that aircraft overflights can constitute a land use under the Pennsylvania Municipalities Planning Code. While we have held in eminent domain actions that aircraft overflights may substantially deprive a landowner of the use and enjoyment of his property so as to constitute a *de facto* taking, *see Westmoreland County Airport Authority Appeal,* 96 Pa. Commonwealth Ct. 306, 507 A.2d 899 (1986), the Township cites no case which holds that aircraft overflights *are* a land use. We decline under the facts of this case to hold aircraft overflights to be a land use.

cally argues that Wings must abate the nonconforming use to relieve the hardship; this is something Wings is not required to do. *See Mack Zoning Appeal,* 384 Pa. 586, 122 A.2d 48 (1956); *Peirce Appeal,* 384 Pa. 100, 119 A.2d 506 (1956).

The fourth requirement of Section 912 is that the granting of the variance not be detrimental to the public welfare. The Board in this case found that:

> Extension of the existing runway will not significantly increase noise or traffic, decrease safety or otherwise create a detriment to the residents of the surrounding communities if such extension is limited to 600 feet, although such a detriment can be anticipated if a greater extension were permitted.

The evidence pertinent to this finding showed that all the noise experts agreed that any increase in noise because of the runway *extension* was at best minimal and that the airport's noise environment would remain relatively unchanged. Indeed most of the surrounding residential developments would find a decrease in the levels of noise as the longer runway would allow pilots to take off from a rolling start, thereby giving pilots the opportunity to gain more altitude over the developments. This is in sharp contrast to the present, extremely noisy, short runway takeoff procedure that must now be utilized at Wings Field, which procedure requires pilots to run the engines up to full power while in the departure area and then take off with full flaps. The only negative testimony elicited about the longer runway was that noise levels at Wings Field would remain about the same *if* pilots disregarded instructions from the airport controller directing them to use a rolling start, and instead used the short runway takeoff procedure. Such testimony was speculative and not highly probable;

thus, it was insufficient to support a finding of adverse impact. *Bureau of Corrections v. City of Pittsburgh*, 516 Pa. 75, 532 A.2d 12 (1987); *Stein v. Easttown Township Board of Supervisors*, 110 Pa. Commonwealth Ct. 293, 532 A.2d 906 (1987). With regard to safety, it would be increased because of the runway extension. The lengthening of the runway would allow installation of microwave and VASI landing systems, and make it easier for two-engine propeller planes to use the field. We agree with the common pleas court, however, that there is no basis in the record to limit the runway expansion to 600 feet as the Board did. The trial court, however, limited the expansion to 1,000 feet, the extent of the hardship they found. We hold, however, that Wings is entitled to all the relief they have requested with regard to the runway, *i.e.,* an extension of 1,200 feet, since we have found that a hardship did exist over the entire tract of the after-acquired property, not just that area covered by the "clear zone" as the trial court concluded.[11]

As to the last factor, that the variance authorized be the minimum variance necessary to afford relief, the Township has waived any appellate review of this issue, since it did not present this issue to the Court of Common Pleas. *Dziedzic v. Upper Hanover Township Zoning Hearing Board*, 66 Pa. Commonwealth Ct. 358, 444 A.2d 810 (1982).[12]

---

[11] We note that Wings has preserved the argument that it would have been entitled to expand the runway under a retroactive application of Section 1303A of the Township Zoning Ordinance. Since we hold that Wings is entitled to a variance, we do not pass upon this issue.

[12] The Township also waived the following issues by failing to present them in *its* appeal, where it had the burden, to the court of common pleas: (1) Wings' hardship was solely economic; and (2) the runway expansion was in actuality rezoning sought in the guise of a

Accordingly, the order of the Court of Common Pleas of Montgomery County is modified to allow a runway extension of 1,200 feet, and as modified, is affirmed.

ORDER

NOW, December 2, 1988, the order of the Court of Common Pleas of Montgomery County in the above-captioned matter is modified so as to allow a runway extension of 1,200 feet, and as modified, is affirmed.

This decision was reached prior to the resignation of Judge MACPHAIL.

---

variance. *See Center City Residents Ass'n v. Zoning Board of Adjustment,* 48 Pa. Commonwealth Ct. 416, 410 A.2d 374 (1980). The Township also attempted to raise additional theories concerning self-inflicted hardship at oral argument of this case before this Court. Since these arguments were not raised below they will not be considered on appeal. *Rhoads v. Lancaster Parking Authority,* 103 Pa. Commonwealth Ct. 303, 520 A.2d 122 (1987).

---

CONCURRING OPINION BY JUDGE CRAIG:

This opinion signifies joinder in all of the sound and well-stated textual body of the majority opinion, and joinder in the result as well.

However, the statements made in footnote 12 cannot be included in that joinder. In that footnote, the majority opinion characterizes some additional arguments of the Township as "issues" and hence declares them waived because the Township did not articulate them below. But the real issues of this case, properly described in the majority opinion, are as follows:

1. Are there unique circumstances?
2. Is there unnecessary hardship?
3. If so, is that hardship a self-inflicted one?
4. Would the variance be detrimental to the community?

All of the points listed in footnote 12 are merely arguments relating to one or more of those issues.

The "solely economic" claim and the "rezoning" claim are just additional aspects of the uniqueness and hardship issues; those claims represent contentions put forth in many zoning cases involving variances.

Moreover, because the "self-inflicted" issue has been in this case all the way, no party is barred from raising additional argument "theories" on appeal. The appellate process need not be a carbon copy of the legal debate below. Any party may pursue a fresh argument and submit additional citations so long as the other side is not ambushed by a new issue.

The decisions cited in footnote 12 do not support the proposition for which they are submitted. In *Center City Residents Assoc. v. Zoning Board of Adjustment,* 48 Pa. Commonwealth Ct. 416, 410 A.2d 373 (1980), this court barred objectors from raising, upon appeal, an issue with respect to notice because that was genuinely a new procedural question entirely distinct from the substantive variance questions which had been pursued below. In *Rhoads v. Lancaster Parking Authority,* 103 Pa. Commonwealth Ct. 303, 520 A.2d 122 (1987), *petition for allowance of appeal denied,* 515 Pa. 611, 529 A.2d 1084 (1987), this court properly declined to entertain an issue involving common law governmental immunity when the parties had pursued only questions of statutory immunity up to that point.

The Township claims and contentions, as listed in footnote 12, are not sufficient to support any result different from that reached by the majority opinion. Discarding them as waived issues is not appropriate and could mislead court and counsel in resolving variance cases in the future.